UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| KIM BERTOLINI-MIER and ROGER MIER, <br><br> Plaintiffs, <br><br> v. <br><br> UPPER VALLEY NEUROLOGY NEUROSURGERY, P.C., DONALD W. AYRES, M.D., and ALICE PECK DAY MEMORIAL HOSPITAL, <br><br> Defendants. | Case No. 5:16-cv-35 |

**OPINION AND ORDER**
(Doc. 19)

In this diversity action, Plaintiffs Kim Bertolini-Mier and her husband Roger Mier sue Upper Valley Neurology Neurosurgery, P.C. ("UVNN"), UVNN physician Dr. Donald W. Ayres, and Alice Peck Day Memorial Hospital ("APD") for medical malpractice and loss of consortium. They allege that, between 2007 and 2011, APD improperly administered and interpreted radiologic studies as indicating that Ms. Bertolini-Mier suffered from multiple sclerosis (MS). (*See* Doc. 8.) Plaintiffs further allege that Dr. Ayres mistakenly relied on APD's findings, misdiagnosed her with MS, and improperly treated her with an MS drug that caused her harm, including a neurological event in 2014 that required extended hospitalization. (*See id.*) APD has filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(2), asserting that it is not subject to personal jurisdiction in Vermont. (Doc. 19.)

In an Opinion and Order dated December 7, 2016, the court concluded that APD had not consented to personal jurisdiction and that APD is not subject to general jurisdiction in Vermont under the restrictive test announced in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).

(*See* Doc. 31.) The court granted Plaintiffs an opportunity to conduct jurisdictional discovery on the question of *specific* jurisdiction. (*Id.* at 13.) Plaintiffs have now completed that jurisdictional discovery, and have filed a supplemental opposition to APD's motion. (Doc. 41.) APD has filed a supplemental reply (Doc. 44), and the court agreed to consider Plaintiffs' sur-reply (Doc. 45) and APD's response (Doc. 47).

## Background

The court reviews the relevant facts set forth in the December 7, 2016 Opinion and Order, with additional facts presented by the parties in their supplemental filings. Ms. Bertolini-Mier first met with Dr. Ayres on August 16, 2007, after being referred to him by her Vermont-based neurologist and primary care physician. (*See* Doc. 44-4 ¶ 2.) Dr. Ayres treated Ms. Bertolini-Mier between August 16, 2007 and April 22, 2014. (*Id.*) During that time, Dr. Ayres and other UVNN physicians ordered MRIs of Ms. Bertolini-Mier. (*Id.* ¶ 3; *see also* Doc. 44-6.) Some of those studies were performed at APD's facility in Lebanon, New Hampshire. (*See* Doc. 44-4 ¶ 4.) According to Mr. Mier, his wife was directed to APD for radiology services, not to any individual physician. (Doc. 41-1 ¶ 2.) Ms. Bertolini-Mier believed that APD was providing those services, and was not told by anyone at any time that she was receiving services from anyone who did not work for APD. (*Id.* ¶¶ 3, 5.)

APD's principal place of business is in Lebanon, New Hampshire; it is a non-profit corporation incorporated in New Hampshire and registered in Vermont to do business as a foreign corporation. (*See* Doc. 8 ¶ 7; Doc. 19-1 ¶ 2; Doc. 21-1 ¶ 8, Doc. 21-7.) APD provides medical services to Vermont patients, advertises in Vermont, and consults with the Vermont Department of Health. (Doc. 8 ¶ 7.) APD has a radiology department, which it advertises on its website. (Doc. 41-8 at 2; Doc. 41-11 at 3.) The website states that APD's "experienced team

2

performs imaging and interprets results—often serving as the first step to patients' improved health and recovery." (Doc. 41-8 at 2) According to the website, APD's radiology department is "staffed by skilled technologists and physicians who are invested in our community." (*Id.*) The website does not indicate that anyone in the radiology department is an independent contractor.

In fact, APD has an arrangement with Valley Radiologists, P.A., under which APD runs the radiology department and produces images, and doctors employed by Valley Radiologists interpret (or "read") the images. (Doc. 41-4 at 5; Doc. 41-11 at 3; *see also* Doc. 44-4 ¶ 5 (the MRIs performed at APD were interpreted by radiologists affiliated with an independent entity that provides radiology services to APD); Doc. 44-5 ¶ 2.)[1] According to Valley Radiologists president Mark Hansberry, M.D., Valley Radiologists is a New Hampshire professional association of radiologists that performs interpretations for diagnostic imaging studies for the Mt. Ascutney Hospital in Vermont, plus three hospitals in New Hampshire, including APD. (Doc. 44-2 at 3; Doc. 44-5 ¶¶ 1–2.)

Valley Radiologists assigns its doctors to particular hospitals, and during the daytime the radiologists are "almost always" physically present at their assigned hospitals. (Doc. 44-2 at 4; *see also* Doc. 44-5 ¶ 3.) If the radiologist is on call and covering for colleagues, she might read images from one of the other hospitals. Sometimes a radiologist works from home to help with balancing the workload or when working only part of a day. During the nighttime, Valley Radiologists personnel work from home. (*See* Doc. 44-2 at 4; *see also* Doc. 44-5 ¶ 3.)

---

[1] APD asserts that it did not have a contract with Valley Radiologists or Valley Radiologists personnel. (Doc. 44 at 4–5.) Plaintiffs agree that there was "nothing in writing," but contend that "there was a very specific understanding, which has since been reduced to writing." (Doc. 45 at 3.) The court does not perceive the dispute over how to characterize the medical privileges arrangement to be material to the specific-jurisdiction issue.

3

Improved technology has made it possible for the radiologists to work remotely or from home. (*See* Doc. 44-2 at 4; Doc. 44-5 ¶ 3.) APD uses a system that allows radiology images (or "films") taken at one location to be read at another location. (*See* Doc. 41-4 at 3.) When a radiologist reads the images, she creates a report. (*Id.* at 3–4; *see also* Doc. 44-4 ¶ 5.) The reports are produced on APD letterhead. (*See* Doc. 41-12.) According to Valley Radiologists manager John Rousseau, there is no way to tell where a report was signed. (Doc. 41-11 at 6.)

Mr. Rousseau describes the Valley Radiologists personnel as the "Medical Directors" or "Chief Medical Officers" of APD's radiology department. (Doc. 41-11 at 3; Doc. 44-3 at 4.) The Valley Radiologists personnel are not compensated by APD, nor are they employees of APD. (Doc. 41-4 at 6; Doc. 41-11 at 3; *see also* Doc. 44-5 ¶ 2.) For radiology patients, APD bills a "technical fee" for its service as the provider of the exam. (Doc. 41-11 at 4.) Valley Radiologists separately bills patients a "physician fee" for providing the reading. (*Id.*; *see also* Doc. 44-5 ¶ 2.)

According to Dr. Hansberry, all but two of Ms. Bertolini-Mier's MRIs performed at APD were interpreted in New Hampshire by Valley Radiologists personnel. (Doc. 44-5 ¶ 3.) Dr. Hansberry states that, "[o]n October 5, 2010, Katherine Gerke, M.D., of Valley Radiologists, used a computer presumably at her home in Vermont when she interpreted Ms. Bertolini-Mier's MRI performed at Alice Peck Day Memorial Hospital the same date." (*Id.*) In a "Third Declaration" dated September 6, 2016, APD President Susan E. Mooney, M.D. concurs that Dr. Gerke read the October 5, 2010 MRI, and that she "most likely" did so from her residence in Vermont. (Doc. 29-1 ¶ 4.) Dr. Mooney asserts that, since Dr. Gerke passed away in July 2013, APD "is unable to say with absolute certainty where she was physically located at that time." (*Id.*) According to Dr. Hansberry, APD had no role in selecting who from Valley Radiologists

would interpret the October 5, 2010 MRI or where the radiologist would be physically located when doing that interpretation. (Doc. 44-5 ¶ 3.)

Plaintiffs criticize APD for misstating facts. (*See* Doc. 41 at 3; Doc. 45 at 1 n.1.) Plaintiffs note that in a prior declaration, Dr. Mooney had asserted that the radiology studies at issue were performed and interpreted "exclusively in New Hampshire." (Doc. 19-1 ¶ 4.) Plaintiffs further contend that Dr. Mooney's September 6, 2016 declaration is also inaccurate insofar as it asserts that the October 5, 2010 MRI was the only study that was interpreted outside of New Hampshire. It appears to be undisputed that, in addition to the image that Dr. Gerke read on October 5, 2010, an MRI of Ms. Bertolini-Mier was performed on September 14, 2011 and was read by Alexei Viazmenski, M.D., using a computer located at Mt. Ascutney Hospital in Vermont. (Doc. 41-5 at 3; Doc. 44-5 ¶ 3.) As with the October 5, 2010 MRI, Dr. Hansberry states that APD had no role in selecting who from Valley Radiologists would interpret the September 14, 2011 MRI or where the radiologist would be physically located when doing that interpretation. (Doc. 44-5 ¶ 3.)

Finally, Plaintiffs suggest that Dr. Mooney cannot claim uncertainty about where the October 5, 2010 MRI was interpreted. Plaintiffs have presented evidence that the October 5, 2010 film was read on a computer identified as "GERKEDESKTOP." (Doc. 41-3 at 2.) Dr. Hansberry testified that, given the name "GERKEDESKTOP," the computer was likely a desktop computer that belonged to Dr. Gerke located at her home in Vermont. (Doc. 41-4 at 3; *see also* Doc. 44-5 ¶ 3 (computer was "presumably" at Dr. Gerke's home in Vermont).)

Aside from the issue of the location where MRIs were interpreted, Plaintiffs have supplied evidence that APD called Ms. Bertolini-Mier's health insurance carrier, Blue Cross Blue Shield of Vermont (BCBS), on a number of occasions between 2009 and 2014 seeking

5

verification of insurance coverage and pre-approval for various tests and procedures. (*See* Doc. 41-7.)

## Analysis

### I.    Rule 12(b)(2) Standard

Under Fed. R. Civ. P. 12(b)(2), a party may move for dismissal for lack of personal jurisdiction. The court may determine a Rule 12(b)(2) motion on the basis of pleadings and affidavits alone, or it may permit discovery, or it may conduct an evidentiary hearing. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam). Here, since the court has allowed jurisdictional discovery, Plaintiffs must make a *prima facie* showing of jurisdiction that includes "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

### II.   Specific Jurisdiction

Generally, "in resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." *Id.* Vermont's long-arm statute, 12 V.S.A. § 913(b), reflects a "clear policy to assert jurisdiction over individual defendants to the full extent permitted by the Due Process Clause." *Id.* (quoting *Bechard v. Constanzo*, 810 F. Supp. 579, 582–83 (D. Vt. 1992)). Thus the two inquiries in this case merge into one: "whether the court's exercise of personal jurisdiction over the defendant satisfies the requirements of due process." *Id.*

"To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168–69 (2d Cir. 2015) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)). The court begins with the first requirement. "Where the claim arises out of, or relates to, the defendant's contacts within the forum—i.e., specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (alterations in original) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). The contacts must not be "random, fortuitous or attenuated." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985)). This test includes a "nexus" requirement: the cause of action must "relate to" the defendant's minimum contacts with the forum. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166–67 (2d Cir. 2010).

Plaintiffs assert that their claims arise out of APD's contacts with Vermont "because APD improperly read some of the radiology studies in Vermont, and because APD communicated with Blue Cross of Vermont on behalf of Ms. Mier a number of times." (Doc. 41 at 4.) APD asserts that its communications with BCBS are irrelevant to the specific-jurisdiction analysis because Plaintiffs' claims do not arise out of those communications. (Doc. 44 at 14 n.5.) Plaintiffs do not respond to that point in their sur-reply, and the court agrees with APD that the communications with BCBS are not sufficiently related to Plaintiffs' cause of action to satisfy the nexus requirement.

7

Regarding the radiology studies that were read in Vermont, APD maintains that the Valley Radiologists personnel, including Dr. Gerke, are independent radiologists, and that specific jurisdiction over APD cannot be asserted based on the unilateral actions of those individuals. (*See* Doc. 44 at 2.) Anticipating that argument, Plaintiffs contend that APD cannot avoid liability because the non-delegable duty doctrine and the doctrines of apparent and actual authority are applicable in this case. (Doc. 41 at 5.) APD asserts that none of those doctrines apply. (Doc. 44 at 2.)

Generally, the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *see also Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) ("[A] defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." (ellipsis in original) (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014))). However, agency relationships "may be relevant" to the issue of specific jurisdiction, and "a corporation can purposefully avail itself of a forum by *directing* its agents or distributors to take action there." *Daimler*, 134 S. Ct. at 759 n.13 (emphasis added); *see also Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015) ("For purposes of specific personal jurisdiction, the contacts of a third-party may be imputed to the defendant under either an agency or alter ego theory. In order to establish jurisdiction under the agency theory, the plaintiff must show that the defendant exercises control over the activities of the third-party.").[2]

---

[2] This court's cases—predating and postdating *Daimler*—have entertained the possibility that a purported agency relationship could support the assertion of specific

Whether the acts of agents are sufficient to confer jurisdiction depends on the particular circumstances. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) ("[A]lthough the commission of some single or occasional acts of the corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it, . . . other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit."); *see also In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 531 (5th Cir. 2014) ("*Daimler* . . . embraces the significance of a principal-agent relationship to the specific-jurisdiction analysis, though it suggests that an agency relationship alone may not be dispositive.").

Here, the parties have argued about whether the radiologists at Valley Radiologists are agents of APD. Plaintiffs have supplied evidence to prove a variety of facts about APD's arrangement with Valley Radiologists and the practices of APD's radiology department. (*See* Doc. 41 at 11.) The court is not persuaded that any of the facts about the arrangement between APD and Valley Radiologists are sufficient for agency *in the jurisdictional context*. The important question for present purposes is whether APD *directed* Valley Radiologists or its personnel to take action in Vermont with respect to Ms. Bertolini-Mier's imaging. On that issue, the court concludes that Plaintiffs have failed to make the requisite showing.

There is simply no evidence that, in any way relevant to Ms. Bertolini-Mier's treatment, APD directed Valley Radiologists or any of the Valley Radiologists personnel to take action in Vermont. Plaintiffs have presented evidence from which a factfinder could conclude that Dr. Gerke read the October 5, 2010 in Vermont. And Dr. Viazmenski read the September 14,

---

jurisdiction. *See Cernansky v. Lefebvre*, 88 F. Supp. 3d 299, 307–08 (D. Vt. 2015); *Jenkins v. Miller*, 983 F. Supp. 2d 423, 447 (D. Vt. 2013).

2011 MRI using a computer located at the Mt. Ascutney hospital in Vermont. But there is no evidence that APD actually directed that either of those films—or any of Ms. Bertolini-Mier's other films—be read in Vermont. Indeed, according to Dr. Hansberry, APD did not have any role in selecting who from Valley Radiologists would interpret the relevant MRIs or where the radiologist would be physically located when doing that interpretation.

At best, Plaintiffs have shown that APD knew (and facilitated) that some of the images produced at the APD radiology department in Lebanon, New Hampshire might be read by Valley Radiologists personnel at other locations, such as the Mt. Ascutney hospital where Valley Radiologists personnel also worked, or at the radiologists' homes. (*See* Doc. 45 at 2 (noting that APD transmitted images to all of its "spokes," and that an APD computer was involved in each of Ms. Bertolini-Mier's studies, including those read in Vermont); *id.* at 3 (asserting that APD knew that studies were read in Vermont from time to time).) That contact with Vermont, the court concludes, is insufficient to constitute purposeful availment.

APD's knowledge and facilitation of occasional remote work was an accommodation (made possible by improved technology), not a purposeful effort to have MRIs interpreted in Vermont. Since technology increasingly enables radiologic images to be transmitted and interpreted almost anywhere, a contrary conclusion could unreasonably render a hospital subject to personal jurisdiction in virtually any location. The radiologists' occasional work in Vermont interpreting films produced in New Hampshire is too random and attenuated to constitute a basis for specific personal jurisdiction.

Although the parties have found few analogous cases, the court has considered the jurisdictional analysis performed by other courts in cases regarding litigation between employers

and their remotely working employees.[3] For example, the First Circuit recently held that an out-of-state employer may be subject to jurisdiction when it reached into the forum state to hire and support a remotely-working employee there. *See Cossart v. United Excel Corp.*, 804 F.3d 13 (1st Cir. 2015). Here, however, APD's arrangement was not with an individual Vermont employee, but was instead with Radiology Associates—a New Hampshire professional association. The nature of the remote work performed by Valley Radiologists personnel is nothing like the arrangement in *Cossart*. In that case, a Kansas-based employer recruited a Massachusetts-based employee, provided him with equipment that he needed to work remotely from Massachusetts, and registered a sales office with Massachusetts to facilitate his work for the company. The Massachusetts-based employee performed his work primarily from Massachusetts.

Here, by contrast, the Valley Radiologists personnel interpreting films from APD worked primarily at the hospital in New Hampshire. APD could have anticipated occasional remote work in Vermont, but no facts suggest that APD established any sort of remote outpost in Vermont for the interpretation of MRI films created in N.H. Although this case involves a personal medical service in which a portion of the requisite medical analysis was performed within the forum state of Vermont, the circumstances of this case are still much closer to the usual cases in which a patient travels out-of-state for treatment. In such cases, the plaintiff is most frequently obligated to file suit in the state where he or she received treatment. *See Gelineau v. N.Y. Univ. Hosp.*, 375 F. Supp. 661, 667 (D.N.J. 1974) ("When one seeks out

---

[3] Remote work is becoming increasingly common in some sectors, including the medical and legal fields. *See* Allison Deerr, *BigLaw Embraces the Remote Work Trend*, ABA Journal (Aug. 1, 2017), http://www.abajournal.com/magazine/article/biglaw_remote_flexible_workplace_telecommute. As one court has recently observed, "[r]emote employment raises challenges that the law is now struggling to resolve." *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 352 (E.D. Pa. 2016).

services which are personal in nature, such as those rendered by attorneys, physicians, dentists, hospitals or accountants, and travels to the locality where he knows the services will actually be rendered, he must realize that the services are not directed to impact on any particular place, but are directed to the needy person himself.").

Here, Ms. Bertolini-Mier sought treatment from a New Hampshire hospital. The hospital entered into an arrangement with Valley Radiologists to supply interpretations of MRI films for patients who came to APD's New Hampshire facility. APD never purposefully engaged in activities in Vermont related to Ms. Bertolini-Mier's care. It was a matter of fortuity that two of her films were read by independent physicians with professional privileges at ADP who worked on occasion in Vermont (Dr. Viazmenski) or made her home in Vermont (Dr. Gerke). Because these contacts with Vermont were not directed or ordered by ADP—which was uninvolved in the choice or location of the radiology practitioners—these contacts do not meet the agency test for purposeful contact through third parties with the forum state.

Because the court concludes that APD lacks the minimum contacts with Vermont necessary for specific personal jurisdiction in this case, the court does not reach the "reasonableness" factors that comprise the second prong of the due process inquiry. *See Jenkins*, 983 F. Supp. 2d at 450 ("The Court need not reach the issue of reasonableness with respect to those defendants that have not been shown to have minimum contacts with the forum . . . .").

## Conclusion

Defendant Alice Peck Day Memorial Hospital's Motion to Dismiss (Doc. 19) is GRANTED for lack of specific personal jurisdiction.

Dated at Rutland, in the District of Vermont, this 13 day of September, 2017.

Geoffrey W. Crawford, Judge
United States District Court